IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


TRANSPORTATION INSURANCE CO.          :
                    Plaintiff          :
                                       :
    v.                                 :          3:CV-06-2386
                                       :          (JUDGE VANASKIE)
C.F. BORDO, INC., FRANK RASIELESKI,    :
and THE PMA INSURANCE GROUP            :
                    Defendants         :


<u>MEMORANDUM</u>

    Plaintiff, Transportation Insurance Company ("TIC"), instituted the present action

seeking a declaration that it is not obligated to defend or indemnify Defendant C.F. Bordo,

Inc. in an underlying state court action brought against C.F. Bordo by Frank Rasieleski, who

is also named by TIC as a Defendant in this action.  In addition to naming as Defendants its

insured (C.F. Bordo) and the party who has sued its insured (Rasieleski), TIC has joined

Pennsylvania Manufacturers Association Insurance Group ("PMA") as a Defendant,

contending that PMA may owe a duty to defend and indemnify C.F. Bordo in the underlying

case.  TIC and PMA have both moved for summary judgment.  (Dkt. 52 & 57.)[1]  At issue on

the summary judgment motions are (a) whether TIC is estopped from denying coverage by

its delay in notifying C.F. Bordo of its reservation of rights, and (b) whether the claims

_____

    [1]  For the convenience of the reader of this Memorandum opinion in electronic
format, hyperlinks to the Court's electronic record and to authority cited herein have been
inserted.  No endorsement of any provider of electronic resources is intended by the use of
hyperlinks.

asserted in the Rasieleski case fall within the definition of "occurrence" found in the TIC and PMA policies.  As to the first issue, there are genuine disputes of material fact that compel denial of TIC's motion.  As to the latter issue, it is clear that Rasieleski's claims do not fall within the definition of "occurrence," compelling entry of judgment in favor of PMA.

I. Background

Frank Rasieleski, a residential homeowner, hired C.F. Bordo to perform repair work and re-coat the exterior of his home.  (C.F. Bordo's Statement of Material Facts ("BSMF"), Dkt. 62, at ¶ 3.)  The work began on April 27, 1994, and was completed on October 12, 1994.  (Jan. 24, 2000 Letter, Dkt. 70-5, at 2.)[2]  The repair and re-coating of the outside of the residence included the installation of expansion joints, repair of cracks and bulges, removal of loose finish, cleaning of the surfaces, re-coating of the surfaces with Genesis material, re-finishing of the Genesis material, and placement of Dryflex coating over the Genesis material for extended protection.  (Estimates, Dkt. 70-5, at 5-6, 8.)  Rasieleski had his builder, Myron Krenitsky, oversee the work.  (Jan. 24, 2000 Letter, Dkt. 70-5, at 3.) Caesar F. Bordo, then President of C.F. Bordo, stated that some of the original exterior finish system, plywood, and insulation had to be replaced due to moisture and termite presence, and that it was clear that the walls of the residence already had existing moisture

---

[2]   Citations to page numbers refer to the electronic page number of the document in the Court's electronic record.

and termite problems before he began work.  (Id.)  Portions of the exterior system, plywood, and insulation were replaced before C.F. Bordo completed the job.  After the work was complete, Rasieleski requested "minor touch ups," which totaled two hundred and fifty two (252) man hours.  (Id.)

Soon after C.F. Bordo completed the job, Rasieleski became dissatisfied with the work.  Rasieleski alleges that damages were discovered and photographed in June 1996.  (PMA Statement of Material Facts ("PMASMF"), Dkt. 53, at ¶ 7.)  In March of 1999, the Genesis material used on the residence began to disintegrate and pull away from the surface of the home whenever it rained, causing rain water to penetrate the seal coat of the Genesis product and infiltrate the styrofoam backing and wood construction of the residence.  (Underlying Complaint, Dkt. 57-6, at ¶¶ 6-7; see James Bordo Deposition, Dkt. 61-4, at 7-8; Caesar Bordo Deposition, Dkt. 61-3, at 11; TIC Statement of Material Facts ("TICSMF"), Dkt. 59, at ¶ 7.)  Although extensive damage to the outside of the home was alleged, no interior damage to the home was ever observed. (James Bordo Deposition, Dkt. 61-4, at 9; Caesar Bordo Deposition, Dkt. 61-3, at 14.)  Rasieleski gave notice of the damage to C.F. Bordo and made a demand for reimbursement.  C.F. Bordo refused to provide any form of reimbursement.  (Underlying Complaint, Dkt. 57-6, at ¶ 14.)

Between May 17, 1995, and May 17, 1997, TIC insured C.F. Bordo ("TIC Policies").  (TICSMF, Dkt. 59, at ¶ 10.)  PMA provided general liability insurance to C.F. Bordo for two

policy periods beginning on May 17, 1997, and ending on May 17, 1999 ("PMA Policies").

(PMASMF, Dkt. 53, at ¶ 8.)  The pertinent terms of the TIC Policies and PMA Policies

(collectively "the Policies") are the same.  The Policies include language which provide that

the "insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury'

or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage

territory.'"  (PMASMF, Dkt. 53, at ¶ 10; BSMF, Dkt. 62, at ¶ 10; 1995 Policy, Dkt. 57-7, at 9;

1996 Policy, Dkt. 57-8, at 15; 1997 Policy, Dkt. 57-9, at 16.)  The Policies define

"occurrence" as "an accident, including continuous or repeated exposure to substantially the

same general harmful conditions." (PMA Policy, Dkt. 61-2, at 19; 1995 Policy, Dkt. 57-7, at

18; 1996 Policy, Dkt. 57-8, at 22; 1997 Policy, Dkt. 57-9, at 24.)  None of the Policies,

however, define "accident."

On June 18, 1999, Rasieleski filed an action against C.F. Bordo in the Court of

Common Pleas for Lackawanna County, Pennsylvania, under the caption, <u>Rasieleski v.</u>

<u>C.F. Bordo</u>, 99-CV-3019 (the "underlying litigation").  (PMASMF, Dkt. 53, at ¶¶ 1-2; State

Docket, Dkt. 54-10, at 2.) The underlying litigation included claims for breach of an implied

warranty of merchantability, breach of a warranty of fitness, breach of contract, and

entitlement to attorney fees under the Magnuson-Moss Act.  (PMASMF, Dkt. 53, at ¶ 5.)

Rasieleski's alleged damages related to the cost of removal and replacement of the

defective Exterior Insulation Finishing System ("EIFS") installed by C.F. Bordo.  (<u>Id.</u> at ¶ 6.)

4

Rasieleski also alleged that C.F. Bordo sold and installed defective EIFS cladding and specifically that the EIFS "chipped, cracked, and buckled," which forced him to remove the EIFS and re-insulate and refinish the entire exterior of his home.  (Id. at ¶ 4; TICSMF, Dkt. 59, at ¶¶ 2-3.)

On October 15, 1999, C.F. Bordo made a claim for insurance coverage to TIC for the underlying litigation.  (Fax, Dkt 61-5, at 2-3; TICSMF, Dkt. 69, at ¶ 22.)  On December 23, 1999, a default judgment was entered against C.F. Bordo in the underlying action. (TICSMF, Dkt. 69 at ¶ 22.)  On that same day, TIC hired the law firm of Marshall, Dennehey, Warner, Coleman & Goggins ("Marshall Dennehey"), to represent C.F. Bordo's interests in the underlying litigation.  (Dec. 23, 1999 Letter, Dkt. 61-7, at 2.)  On January 3, 2000, Marshall Dennehey petitioned to open and/or strike the default judgment and on March 16, 2000, the default judgment was opened.  (Id.; Mar. 17, 2000 Letter, Dkt. 61-8, at 2.)  C.F. Bordo sent TIC a letter on January 24, 2000, which provided a synopsis of the work it had performed at the Rasieleski residence and its opinion that there was water and termite damage present before the work began.  (Jan. 24, 2000 Letter, Dkt. 70-5, at 2.)

Based on a conflict of interest, Marshall Dennehey stepped down as counsel on November 14, 2000, and Irwin Schneider & Associates was retained as counsel.  Irwin Schneider represented C.F. Bordo, under TIC direction, for approximately five years, between November 2000 and December 2005.  (TIC Response to Statement of Material

Fact ("TICRTSMF"), Dkt. 56-2, at ¶ 20.)

In a September 18, 2001 letter from Irwin Schneider to Rosemarie Winegarner at TIC, Schneider stated that Rasieleski was "extremely vague" in his interrogatory answers, and he thus planned on filing a motion for more specific answers.  (Sept. 18, 2001 Letter, Dkt. 56-6, at 2.)  Moreover, Schneider requested permission to conduct an on-site inspection of the residence and schedule depositions of Rasieleski, Jack Martin (a witness), and Myron Krenitsky (Rasieleski's representative in charge of the job).[3]  (Id.)  Although no written permission to perform these acts has been provided to the Court, TIC's File Activity Report Notes for October 1, 2001, state that Schneider would set up an on-site inspection and depose the listed people.  (File Activity Report, Dkt. 56-7, at 2.)  Schneider testified that TIC failed to authorize requested discovery procedures, including discovery to determine whether third parties should be joined to the litigation, and that TIC failed to permit him to retain an expert, despite his opinion that an expert was necessary to maintain a proper defense.  (Dkt. 54-12, at 5, 6, 9-10, 12.)

Two and a half years after the underlying litigation was filed, TIC sent a reservation of rights letter, dated April 24, 2002, to C.F. Bordo.  (Dkt. 74-6, at 2.)  The letter discussed the "potential policy conditions, restrictions, definitions, and exclusions that might affect

---

[3] The letter closed with the statement "I'll wait to hear from you concerning the scheduling of the depositions and the site view with experts." (Id. at 3.)

indemnity coverage" in the underlying litigation.  (Id.)  It went on to state that "[o]nce the damages have been identified and verified, [TIC] will be in a position to evaluate what allegations the policy covers."[4]

On August 1, 2002, Schneider sent a letter to Rasieleski's counsel regarding the commencement of repairs and requesting the scheduling of depositions for Myron Krenitsky, Rasieleski, and Jack Martin.  (Aug. 1, 2002 Letter, Dkt. 56-9, at 2.)  On February 18, 2004, Schneider sent a letter to TIC in response to a February 12, 2004 request for a status update.  (Dkt. 63, at 2.)  The letter stated that Rasieleski's counsel had not been moving the underlying litigation along and thus Schneider was waiting for Rasieleski to move the matter forward before proceeding.  (Id.)  TIC's File Report reveals that Schneider was advised to continue to monitor the case, file regular status reports, and advise TIC if there were any changes.  (Id.)  The File Report also indicates that on June 24, 2004, the file was transferred to a different claims consultant who requested an update from Schneider and made an inquiry regarding whether PMA, as well as St. Paul (another subsequent carrier), were participating in the defense of C.F. Bordo.  (Activity Report, Dkt. 63, at 2.)  On

---

[4] A second, undated reservation of rights letter was also produced by TIC during discovery in this declaratory judgment action, referring to C.F. Bordo's representation by initial counsel, Marshall Dennehey.  (Undated Reservation Letter, Dkt. 74-9.)  There is, however, no date on this letter and no testimony on the record to verify whether this letter was actually sent, or whether C.F. Bordo ever received it.  (Haworth Deposition, Dkt. 70-7, at 4; James Bordo Deposition, Dkt. 61-4, at 12; Undated Reservation Letter, Dkt. 74-9.)

August 9, 2004, a separate File Report shows that Schneider's request to retain an expert was authorized, and that the claims consultant made another request for information regarding whether PMA and St. Paul were participating in the defense.  (Dkt. 56-10, at 2.)

Schneider's representation ceased in December of 2005, due to untimely payment of bills by TIC, and the law firm of Kent & McBride was retained to represent C.F. Bordo. (TICSMF, Dkt. 56-2, at ¶ 20; July 11, 2005 Letter, Dkt. 56-12, at 2; Aug. 17, 2005 Letter, Dkt. 56-13, at 2.)  On November 11, 2006, Kent & McBride unsuccessfully moved for leave to join Myron Krenitsky as a defendant.  (Docket Sheet, Dkt. 54-10, at 3.)  The motion was denied on November 30, 2006.  (Order, Dkt. 54-13, at 2.)  In a status letter from Kent & McBride, TIC was notified that discovery would be completed by December 9, 2006, and that the parties were still working to schedule the deposition of Myron Krenitsky, which was the last deposition to be taken in the matter.  (Nov. 28, 2006 Letter, Dkt. 61-9, at 2.)  TIC commenced this declaratory judgment action on December 12, 2006, more than seven (7) years after it accepted the defense of C.F. Bordo and more than four (4) years after it sent a reservation of rights notice to C.F. Bordo.

On February 9, 2007, TIC was notified that discovery in the underlying litigation had been completed, was provided with a copy of the expert's finalized report, and advised that as of February 24, 2007, either party could certify the case for trial.  (Feb. 9, 2007 Letter, Dkt. 61-10, at 2-3.)   The letter went on to state that although the motion to join Krenitsky

had been denied, an indemnification action against Mr. Krenitsky was possible should Rasieleski be successful in his claim.  (Id. at 3.)

TIC's declaratory judgment action was initially brought against only C.F. Bordo and Frank Rasieleski.  (Dkt. 1.)  The Complaint seeks a declaration that TIC does not owe coverage, including the duty to defend or indemnify, in the underlying litigation, and that TIC is entitled to damages based on fees, expenses, costs, and disbursement made in the current and underlying litigation.  (Id.)  On May 9, 2007, TIC requested the entry of default against Frank Rasieleski for failure to plead or otherwise defend.  (Dkt. 12.)  On May 18, 2007, the Clerk of Court entered Rasieleski's default.[5]  (Dkt. 20.)

A summons was sent to PMA on June 6, 2007, alerting PMA to both the current and underlying claims, and joining it as a party in the current action.  (Summons, Dkt. 54-5, at 2.)  In a July 19, 2007 letter, PMA responded that it did not believe it had a duty to defend in the underlying litigation based on the lack of documentation to establish "an occurrence resulting in property damage during the PMA policy periods (5/17/97 to 5/17/99)."  (July 19, 2007 Letter, Dkt. 54-6, at 2.)

On August 31, 2007, TIC filed an Amended Complaint, which included causes of action against PMA.  (Dkt. 30.)  PMA filed a Motion for Summary Judgment on June 25,

---

[5] TIC's motion for a default judgment against Rasieleski was denied, without prejudice, by Order dated September 30, 2008. (Dkt. 79.)

2008 (Dkt. 52), and TIC filed a Motion for Summary Judgment on July 9, 2008.  (Dkt. 57.)
Both TIC and PMA assert that the provisions of their respective Policies do not provide
coverage for the underlying litigation. The motions have been fully briefed and oral
argument was held on February 18, 2009.

II. Discussion

A. Standard of Review

 Summary judgment should be granted when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and . . . the moving party is entitled to a judgment
as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or
non-existence might affect the outcome of the suit under applicable law.  Anderson v.
Liberty Lobby Inc., 477 U.S. 242, 248 (1986).   "Facts that could alter the outcome are
material facts."  Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994).
"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the
evidence is such that a reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248.

 Initially, the moving party must show the absence of a genuine issue concerning any
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All doubts as to the
existence of a genuine issue of material fact must be resolved against the moving party,

and the entire record must be examined in the light most favorable to the nonmoving party.

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party

has satisfied its burden, the nonmoving party "must present affirmative evidence in order to

defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257.

Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand

a motion for summary judgment once the moving party has presented evidentiary materials.

Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires

the entry of summary judgment if there was adequate time for discovery and a party "fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at

322.

      "Whether a particular loss is within the coverage of an insurance policy is a question

of law which may be decided on a motion for summary judgment in a declaratory judgment

action." Lebanon Coach Co. v. Carolina Cas. Ins. Co., 675 A.2d 279, 283 (Pa. Super. Ct.

1996), app. denied, 687 A.2d 378 (Pa. 1997) (citing Equibank v. State Farm Mut. Auto. Ins.

Co., 626 A.2d 1243, 1245 (Pa. Super. Ct. 1993), allocatur denied, 639 A.2d 28 (Pa. 1994));

Redevelopment Auth. of Cambria County v. Int'l Ins. Co., 685 A.2d 581, 585 (Pa. Super. Ct.

1996).  Before addressing the coverage question, however, C.F. Bordo's argument that TIC

waived its right to disclaim coverage by not timely reserving its right to do so must be

considered.

B. Timeliness of Reservation of Rights Letter

     In response to TIC's Motion for Summary Judgment, C.F. Bordo claims that TIC waived its right to disclaim coverage due to untimely issuance of the April 2002 reservation of rights letter.  "[T]he general rule is that an insurance company may not assume the defense of a suit which entails relinquishing to the insurer the management of the case and then later deny liability under the policy."  Cont'l Ins. Co. v. Kovach, Civ. A. No. 05-1152, 2007 WL 2343771, at *8 (W.D. Pa. Aug. 14, 2007).  An insurer, however, "may protect its rights under a policy by a timely reservation of rights which fairly informs the insured of the insurer's position."  Id.  Failure to provide timely notice of a reservation of rights may preclude the insurer from later denying a duty to defend and/or a duty to indemnify its insured.  See Merchants Mut. Ins. Co. v. Artis, 907 F. Supp. 886, 891 (E.D. Pa. 1995).  When a party seeks to estop an insurer from withdrawing from a case, the burden is on the party asserting the estoppel claim to establish that defense by clear, precise, and unequivocal evidence.  Id.

     C.F. Bordo claims that the earliest a reservation of rights letter was received by it was in April of 2002, more than two and a half years after the underlying litigation began.[6]

---

    [6] Insofar as C.F. Bordo claims that the April 2002 reservation of rights letter was never sent, and thus never received, the allegation is without merit.  Attached to the reservation of rights letter is the envelope in which the letter was sent, with the handwritten

(Dkt. 70, at 8; Apr. 2002 Reservation of Rights, Dkt. 74-6, at 2.)  TIC counters that, although the April 2002 letter was received two and a half years after litigation began, a separate, earlier letter was sent soon after Marshall Dennehey was retained as counsel.  (Bordo Reply Brief, Dkt. 73, at 11-12.)  There is no evidence, however, that the first reservation of rights letter was received.

Pennsylvania courts have "refused to apply a strict waiver theory or a theory of presumptive prejudice."  Mendel v. Home Ins. Co., 806 F. Supp. 1206, 1215 (E.D. Pa. 1992) (holding that a delay of nearly four years between the date of filing of the complaint and issuance of the reservation of rights letter did not conclusively establish prejudice).  C.F. Bordo argues that a two and a half year delay in TIC issuing a reservation of rights letter is presumptively prejudicial.  Prejudice to the insured, however, will not be presumed nor may an insured "expand the coverage for which it paid through waiver."  Rock-Epstein v. Allstate Ins. Co., Civ. A. No. 07-2917, 2008 WL 4425059, at *4 (E.D. Pa. 2008) (citing Consol. Rail Corp. v. Hartford Accident & Indem. Co., 676 F. Supp. 82, 85 (E.D. Pa. 1987)). Pennsylvania courts thus impose estoppel "only when there is actual prejudice, that is, when the failure to assert all possible defenses causes the insured to act to his detriment in

---

note "Frank Rasieleski" on the front.  (April 2002 Reservation of Rights, Dkt. 74-6.) Although the author of the handwritten note is unknown, the document was produced by C.F. Bordo during discovery.  It is thus clear that the reservation of rights letter was received by C.F. Bordo.

reliance thereon." Id.

C.F. Bordo argues that prejudice is apparent because TIC allowed a default judgment to be entered against C.F. Bordo in the underlying litigation.  That judgment, however, was opened soon after it was entered, and thus, did not prejudice C.F. Bordo. See Mendel, 806 F. Supp. at 1215; Rock-Epstein, 2008 WL 4425059, at *4.

In support for the claim that prejudice is lacking, TIC avers that neither Caesar nor James Bordo was dissatisfied with the representation provided by TIC.  This, however, in and of itself, does not disprove prejudice.  Neither Caesar nor James Bordo is trained in the law, and thus, their satisfaction with the representation received does not prove that it was not prejudicial.

The failure to timely join additional parties and the delays in discovery that may be attributable to TIC may well have caused prejudice.  After all, TIC was in control of the defense of C.F. Bordo.  Whether C.F. Bordo was prejudiced by the manner in which TIC conducted the defense, as well as the question as to when C.F. Bordo actually received a reservation of rights letter, are questions for the fact-finder.  See Mendel, 806 F. Supp. at 1216; Rock-Epstein, 2008 WL 4425059, at *4.  Accordingly, as there are significant issues of fact regarding what date the reservation of rights letter was received and whether the delay in notifying C.F. Bordo of TIC's reservation of rights caused prejudice to C.F. Bordo,

TIC's Motion for Summary Judgment will be denied.[7]

## C. Policy Coverage

PMA moves for summary judgment on the ground that Rasieleski's claims against C.F. Bordo are not covered under the general liability policy it issued to C.F. Bordo.  "'The purpose and intent of a general liability insurance policy is to protect the insured from liability for essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking.'" Redevelopment Auth. of Cambria County, 685 A.2d at 589.  "General liability policies 'are intended to protect against limited risks and are not intended to act as performance bonds.  An insured, therefore, must assume the risk of the quality of its product and its work.'" Meridian/State Farm Auto Ins. Co. v. Franklin, No. Civ. A. 04-573, 2004 WL 2988518, at *5 n.3 (E.D. Pa. Dec. 23, 2004) (quoting Ryan Homes, Inc. v. Home Indem. Co., 647 A.2d 939 (Pa. Super. Ct. 1994)).

The PMA Policies apply to "'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . ." (PMA Policy, Dkt. 61-2, at 8.)  The policy defines "occurrence" as: "an accident, including continuous or repeated exposure to substantially the same general

---

[7] Because the estoppel issue may not be resolved on a summary judgment motion, there is no need to adjudicate TIC's contention that Rasieleski's claims against C.F. Bordo are not covered by its policy.

harmful condition." (Id. at 19.)  The term "accident" is not defined in the PMA Policies.

The Pennsylvania Supreme Court in Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co., 908 A.2d 888 (Pa. 2006), after reviewing the common usage of the word "accident," found that an "accident" was an "'unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'  The key term in the ordinary definition of 'accident' is 'unexpected.'" Id. at 898.  The court went on to determine that his definition "implies a degree of fortuity that is not present in a claim for faulty workmanship.'" Id.  Moreover, "the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship.  Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' . . . ." Id. at 899.  Significantly, the Pennsylvania Supreme Court explicitly endorsed the view that a comprehensive general liability policy, like that issued by PMA, affords "coverage . . . for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." Id. at 899 n.10 (quoting Roger C. Henderson, "Insurance Protection for Products Liability and Completed Operations; What Every Lawyer Should Know," 50 Neb. L. Rev. 415, 441 (1971).  Rasieleski's claims fall squarely within the economic loss claims arising out of allegations of faulty performance of a construction contract, and do not sound in tort for physical damage.

16

Kvaerner was applied in Millers Capital Ins. Co. v. Gambone Bros. Dev. Co., Inc.,

941 A.2d 706, 712 (Pa. Super. Ct. 2008), app. denied, 963 A.2d 471 (Pa. 2008), in the

context of a coverage dispute involving facts similar to those presented here.  The

underlying complaints in Millers alleged that "Gambone and/or its subcontractors built

homes with defective stucco exteriors, windows, and other artificial seals intended to protect

the home interiors from the elements." Id. at 713.  Gambone averred that the claims in the

underlying litigation did "not merely involve claims for faulty workmanship that led to the

failure of the stucco exteriors but also involve[d] claims for ancillary and accidental damage

caused by the resulting water leaks to non-defective work inside the home interiors." Id.

Gambone went on to argue that even though the initial external damage may not constitute

an "occurrence," the resulting water damage did.  Id.  The Pennsylvania Superior Court did

"not see any merit in the distinction Gambone" attempted to create.  Id.  The court stated

that "natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage,

effect, or consequences caused ab initio by faulty workmanship also cannot be considered

sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an

occurrence based CGL policy."  Id.; see also Wausau Underwriters Ins. Co. v. State Auto

Mut. Ins. Co., 557 F. Supp. 2d 502, 516 (D.N.J. 2008) ("under the plain language of the

policies, the mere allegation that the stone fascia are deteriorating does not trigger

coverage").

C.F. Bordo attempts to argue that the language of the contract is ambiguous and contradictory.  The Pennsylvania Superior Court in <u>Millers</u>, however, held that the exact same definition of "occurrence" was "unambiguous as a matter of plain language and judicial construction."  <u>Millers</u>, 941 A.2d at 717.

Although C.F. Bordo may have expected the PMA Policies to protect it from all liability, whether that liability arose from a breach of contract or a tort action, the reasonable expectations doctrine does not apply.  An insured cannot avoid the plain implications of an unambiguous coverage limitation by claiming it expected to be covered for any and all losses.  As explained in <u>Millers</u>, if courts "were to allow an insured to override the plain language of a policy limitation anytime he or she was dissatisfied with the limitation by simply invoking the reasonable expectations doctrine, the language of insurance policies would cease to have meaning and, as a consequence, insurers would be unable to project risk."  <u>Id.</u>  Stated otherwise, an expectation of coverage contrary to unambiguous policy limitations is not reasonable.

C.F. Bordo also avers that <u>Millers</u> and <u>Kvaerner</u> are distinguishable as the underlying claim in this action is premised on a tort, as opposed to a contractual obligation.  In support of this assertion, C.F. Bordo relies upon the fact that Rasieleski has presented breach of implied warranty claims.

It is clear that "a claim is contractual if the duty allegedly breached was a duty owed

18

pursuant to a contract." Nationwide Mut. Ins. Co. v. CPB Intern., Inc., No. 3:06cv0363, 2007 WL 4198173, at *7 (M.D. Pa. Nov. 26, 2007). The Pennsylvania Superior Court in Freestone v. New England Log Homes, Inc., 819 A.2d 550, 553 (Pa. Super. Ct. 2003), held that "[a]s to the breach of contract and breach of warranty claims, it is clear that Pennsylvania law does not recognize the applicability of a general liability policy to such causes of action." Additionally, the Eastern District of Pennsylvania in Meridian, 2004 WL 2988518, at *4, found ample Pennsylvania precedent to find that "allegations sounding in tort fell within an insurance policy's exclusionary provision for claims arising out of breach of contract when the misconduct alleged occurred in the performance of the contract."

The language in the Rasieleski complaint indicates that the claims arise out of the contract he had with C.F. Bordo. Each of the claims in the underlying litigation is based on the fact that C.F. Bordo and Rasieleski entered into an agreement for work done to the exterior of Rasieleski's residence. (Dkt. 54-2, at ¶ 5) ("In June of 1994, the Plaintiff entered into a [sic] Agreement with the Defendant, Bordo, for the purchase and installation of . . . .") Without an agreement, the work would not have been performed and thus the damages would not have occurred. See Meridian, 2004 WL 2988518, at *4. The claim is thus contractual; the duties alleged to have been breached were those which were owed pursuant to a contract. Because the "gist of the action" is contractual, C.F. Bordo cannot recast Rasieleski's claims into tort claims to fit the underlying action into the coverage of the

PMA Policies.  See CPB Intern., Inc., 2007 WL 4198173, at *7; Freestone, 819 A.2d at 553 ("these are disputes between parties to a contractual undertaking, not accidental injury.")

C.F. Bordo's citation to Wausau for the assertion that the underlying litigation is premised on a tort theory of liability is unpersuasive.  In Wausau, the District of New Jersey found that the underlying litigation had alleged injuries caused by negligent acts[8] of the insured, and thus, that the negligent acts "may be a sufficiently fortuitous event to constitute an 'accident' and therefore an 'occurrence.'" Wausau Underwriters Ins. Co., 557 F. Supp. 2d at 515.    The court in Wausau distinguished its facts from those in Kvaerner in coming to the conclusion that an "occurrence" had been pled.  The underlying complaint in Wausau did not allege that any contractual relationship existed between the parties, which, the court noted, "is meaningful because the insured in Kvaerner specifically agreed to the contract." Id. at 514.  Here, it is clear that a contractual relationship existed between the parties. Moreover, the allegations in the underlying litigation do not allege any form of negligence, but instead rely on contract theories of liability.  Thus, Wausau's facts are clearly distinguishable, and consequently not controlling.   The causes of action averred in the underlying litigation are claims resulting from a breach of contract, and thus, Kvaerner and Millers are controlling.

The definition of "occurrence" in the PMA Policies is the same as those in Kvaerner

---

[8] The failure to properly design or manufacture the products.

and <u>Millers</u>.[9]  The allegations in the underlying litigation do not concern losses resulting from an "accident" and thus do not concern actions that may be viewed as "occurrences."  As the underlying litigation presents claims that are contractual in nature and the allegations in the underlying complaint do not meet the "occurrence" requirement for coverage under the PMA Policies, PMA's Motion for Summary Judgment on this basis will be granted.

As it is clear that an "occurrence," as defined by the Policies, did not occur in this situation, there is no need to determine whether the "your work" or "your product" exclusions apply.  Moreover, as the underlying litigation is not within the coverage of the PMA Policies, this Court will not determine the timeliness of the notification given to PMA of the underlying litigation, and whether such notice created prejudice.

III. Conclusion

For the reasons stated herein, PMA's Motion for Summary Judgment will be granted, and TIC's Motion for Summary Judgment will be denied.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

---

[9] "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Dkt. 61-2, at 19; <u>Kvaerner</u>, 908 A.2d at 897; <u>Millers</u>, 941 A.2d at 711.)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


TRANSPORTATION INSURANCE CO.          :
              Plaintiff          :
                                   :
    v.          :          3:CV-06-2386
                                   :          (JUDGE VANASKIE)
C.F. BORDO, INC., FRANK RASIELESKI          :
              Defendants          :

ORDER

NOW THIS 30th DAY OF MARCH 2009, for the reasons set forth in the foregoing

Memorandum, IT IS HEREBY ORDERED THAT:

1.  Plaintiff Transportation Insurance Company's Motion for Summary Judgment

(Dkt. 57) is DENIED.

2.  Defendant Pennsylvania Manufacturers Association Insurance Company's Motion

for Summary Judgment (Dkt. 52) is GRANTED.

3.  Pennsylvania Manufacturers Association Insurance Company has no duty to

defend or indemnify C.F. Bordo in the underlying action captioned as Rasieleski v. C.F.

Bordo, and docketed in the Court of Common Pleas for Lackawanna County, Pennsylvania

(Dkt. 99-CV-3019).

4.  A Telephonic Status Conference shall be held on April 17, 2009 at 3:00 p.m.

Counsel for Plaintiff is responsible for making the call to (570) 207-5720 and all parties

should be ready to proceed before the undersigned is contacted.


                                  s/ Thomas I. Vanaskie
                                  Thomas I. Vanaskie
                                  United States District Judge